# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re<br><br>LILBURN A. STEELE,<br><br>Debtor. | Chapter 7<br><br>Case No. 2:08-BK-15496-SSC |
| DIANE MANN, CHAPTER 7 TRUSTEE,<br><br>Plaintiff,<br><br>v.<br><br>LILBURN ALONZO STEELE, RHEMA CHRISTIAN CENTER;<br><br>Defendants. | Adv. No. 09-ap-00635<br><br>**MEMORANDUM DECISION CONCERNING CLAIMS OF THE TRUSTEE AGAINST THE DEBTOR AND RHEMA CHRISTIAN CENTER UNDER SECTIONS 547, 548, 550, AND 727** |

## I. INTRODUCTION

Diane M. Mann, the Chapter 7 trustee in this case, commenced an adversary proceeding against the Debtor, Lilburn A. Steele, and the Rhema Christian Center, seeking recovery of certain transfers, in the aggregate amount of $75,578.77,[1] pursuant to 11 U.S.C. §§ 547, 548(a)(1)(A)

---

**1.** The Trustee has asserted a claim for a turnover of the amount of $75,578.77. However, at trial, the Trustee focused solely on the payment of $74,578.77 to the Rhema Christian Center. For purposes of this Decision, the Court shall amend the amount requested to $74,578.77.

1

- (B), and 550(a)(1). The Trustee also sought to revoke the Debtor's discharge pursuant to 11 U.S.C. §§ 727(d)(1) and 727(d)(2). The Defendants filed an Answer, and various pretrial proceedings were conducted in the Adversary. On April 29, 2010, a joint pretrial statement was filed in the Adversary,[2] and a trial was conducted on July 21, 2010, and November 23, 2010. Thereafter, this Court took the matter under advisement. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 (West 2010). This decision constitutes this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## II. FACTUAL BACKGROUND

The Debtor filed his voluntary petition under Chapter 7 of the Bankruptcy Code on October 31, 2008.[3] Diane M. Mann was duly appointed the Chapter 7 Trustee in this case. On June 9, 2009, she filed her Complaint, seeking relief under Bankruptcy Code Sections 547, 548, 550, and 727, as outlined above.

Rhema Christian Center (the "Center") is a nonprofit Arizona corporation. The Debtor is the founder and pastor of the Center.[4] On or about May 31, 2007, the Debtor purchased a 2006 Bentley automobile for $161,609.28. The Debtor borrowed $30,000 from JPMorgan Chase Bank ("Chase") to assist in the purchase of the Bentley and provided Chase with a lien on the vehicle as security for the repayment of the amount borrowed. On August 20, 2008, 72 days prior to the Debtor filing this Chapter 7 case, the Debtor sold the Bentley for the sum of $100,000. Of the amount received from the sale, the Debtor paid $25,421.23 to Chase to pay its obligation in full and release its lien, and $74,578.77 was deposited into the Center's deposit account. The Debtor had signature

---

**2.** Docket Entry No. 28.

**3.** The bankruptcy case was filed under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

**4.** The Debtor testified that the Center was a church. He told others that he was the "founder and presiding bishop" of the "Rhema Christian Fellowship of Churches, Inc." Exhibit 3, fifth document in the package.

2

authority over the Center's deposit account at the time. The Debtor did not disclose the sale of the Bentley, the payoff of the Chase lien, or the transfer of funds to the Center's account on his Statement of Financial Affairs. On August 20, 2008, the Debtor was insolvent.

The Debtor listed a residence located at 1815 W. Calle Escuda, Phoenix, Arizona on his Schedule A, with a value of $585,000 and a lien against the residence in the amount of $674,067 on Schedules A and D.[5] The Schedules stated that the Debtor intended to surrender this residence.[6] The Debtor did claim a homestead exemption for the residence, in the amount of $150,000.[7] The Debtor also listed household goods and furnishings with a value of $2,100 on Schedule B, Item 4,[8] but the furniture at the residence included antiques and other items with a value far in excess of $2,100. The Debtor claimed an exemption for household goods and furnishings located at the 1815 W. Calle Escuda residence in the amount of $4,000.[9] The Debtor stated that he owned no jewelry or furs.[10] Although the Debtor testified that the white furniture in the living room of the Calle Escuda residence belonged to the Center, he later told another court that the white furniture was community property which should be sold, with one-half of the net proceeds to be paid to him.[11] Unfortunately, at trial, the Debtor disclosed that all of the white furniture in the living room of the Calle Escuda residence had been

---

5. Exhibit 2.

6. Id. at Schedule A.

7. Id. at Schedule C.

8. Id. at Schedule B, Item 4.

9. Id. at Schedule C.

10. Id. at Schedule B, Item 7.

11. Exhibit 5 or D, ¶11d. The white furniture was allegedly acquired for the Debtor, since he had acquired a new home, and the Board of Directors wanted him to have "something nice" to entertain individuals for Center gatherings at the Debtor's residence. However, the Court notes that Exhibit E, specifically ¶2, is an amended document, filed in September 2009 by the Debtor in his divorce proceeding after the Trustee had brought to the Debtor's attention that his bankruptcy schedules were inconsistent with what the Debtor had filed in the state court.

3

placed in storage, but that it had burned in September 2010, while in storage, and was a total loss. The furniture was uninsured.

The Debtor also stated that he was unemployed,[12] but the Debtor was actually receiving the sum of $8,000 to $10,000 per month from the Center. Although the Debtor received funding from the Center on a monthly basis, the Debtor could not recall any documentation provided to him by the Center as to the money distributed to him. The Debtor conceded on cross examination that the last time he filed a personal income tax return was in 1999. The Debtor also could not explain the deposit of $4,000 and $1,000 to his personal Arizona Federal Credit Union Account in May 2008.[13]

Charlene Dean, who is on the Board of Directors of the Center, confirmed that the Center does take care of the "living" and "driving" bills of the Center's Bishop, who is the Debtor. She provided no documentation in support of her testimony.[14]

---

**12.** Exhibit 2, at Schedule I. The Debtor also stated, on Schedule I, that he was receiving social security in the amount of $637 per month, and that he received "temporary support from church" in the amount of $1,300 per month. He stated at the bottom of Schedule I that he was seeking additional employment and that he expected his income to increase. He stated that he had been separated from his wife for almost 2 years and that he "has resided in a separate household for at least the last 9 months." However, the box was not checked at the top of Schedule J, and there was no separate disclosure of the expenses of the separated spouse. The Debtor also only listed social security as his sole source of income for 2008, 2007, and 2006. *See* Exhibit 2, Statement of Financial Affairs, Item 2. He listed no other income. Id. at Statement of Financial Affairs, Item 1.

**13.** Exhibit 3, thirteenth page in the packet. The Debtor stated that he believed that he received the distributions to carry on church business, but neither he nor the Center had any documentation to support such testimony. Exhibit 9 is a check from the Center, made payable to the Debtor in the amount of $4,000, with a date of May 9, 2008. There is no indication that the check was to reimburse the Debtor or was to be utilized for "church" business. Yet the Center knew how to indicate that funds were being given to reimburse the Debtor for funds expended on behalf of the Center. *See* Exhibit 9, the check dated September 5, 2008, in the amount of $2,000, with a notation in the bottom-left that it was to reimburse the Debtor for funds expended from the Debtor's personal account.

**14.** Ms. Dean testified that it was not unusual to place an individual's name on the title of a vehicle purchased in "furtherance of the ministry" of the Center. She recalled that a 1999 Navigator had been purchased by an individual, but it was for the benefit of the Center. She testified that the

4

To the extent that the Debtor wished to claim that he lived in the residence owned by the Center or his estranged spouse, or that he held the furniture or other items for someone else, he did not disclose that on his Statement of Financial Affairs.[15] The Debtor failed to disclose that he was married.[16]

The 2006 Bentley

The Debtor did not list the prepetition transfer of the 2006 Bentley on his Schedules.[17] The Debtor testified that the Center initially purchased a 2001 Bentley, valued at $88,000. The Bentley was titled in the name of the Center. The Center allowed the Debtor to drive the vehicle. It is clear that although the Debtor may have utilized the vehicle for the Center's business, he also drove the vehicle for his personal use. Within a year, the 2001 Bentley suffered a catastrophic event, a "blown engine" due to a mechanical error by the Scottsdale dealership that provided the Bentley. The Scottsdale dealership offered to replace the 2001 Bentley with a 2006 Bentley, but because of the $30,000 difference in value, required that additional money be provided to pay for the 2006 Bentley. Although the Debtor testified that the Center was unable to provide the $30,000, the Debtor did not provide any books or records of the Center to support the inability of the Center to purchase the vehicle. The Center, also a Defendant in this Adversary, provided no documentation to support the

---

Board of Directors had authorized the Debtor to purchase the 2006 Bentley in the name of the Center, that a vote had been taken, and that the Board's approval was reflected in the minutes kept by the Center. On cross examination, the Trustee's counsel questioned this testimony, and asked why such documentation had not been produced for the Trustee to review, as set forth in a Rule 2004 Examination Order and request for production of documents. No one had any explanation as to why the Center had not produced these documents. Ms. Dean conceded that she had no idea that the Debtor had filed a bankruptcy petition or that he had sought a divorce until she learned of such matters during the course of the trial in this Adversary.

15. Exhibit 2, Statement of Financial Affairs, Item 14.

16. Id. at Statement of Financial Affairs, Item 16.

17. Id. at Statement of Financial Affairs, Item 10a.

5

Debtor's testimony.[18] The documentation from the Scottsdale dealership reflected that the Debtor purchased the 2006 Bentley on May 31, 2007, and that he provided $51,609.28 as a down payment.[19]

More troubling was the Debtor's testimony that the 2006 Bentley was an "investment" for the Center. In May 2007, the 2006 Bentley had a purchase price of $161,609.28. From May 2007 to August 2008, the Debtor conceded that he drove the Bentley until it was sold. The vehicle was sold for only $100,000.[20] Over 15 months, the car lost $61,609.28 in value. The Debtor also conceded that it "cost the Church" about $3,000 per month for him to drive the Bentley. The Debtor did not list the payoff of Chase or the sale of the vehicle on his Statement of Financial Affairs.[21]

Oswald Hopkins, Head Deacon at the Center and also on the Board of Directors testified at trial. He stated that it was not unusual for the Center to seek out an individual with good credit, and place the name of that individual on a vehicle to be purchased by the Center. He stated that in 2005, the Center purchased an Escalade for the pastor, and the Board of Directors for the Center decided to use Mr. Hopkins' credit to purchase the vehicle. However, his testimony was specifically that he "cosigned" for the vehicle, and that the vehicle was also in the name of the Center. He also conceded that although the Board of Directors discussed the purchase of the 2001 Bentley at a Board meeting, he was not in attendance. Mr. Hopkins reviewed an exhibit evidencing the purchase of the

---

**18.** The Trustee did provide a balance sheet, as of December 31, 2007, from the Center. However, the balance sheet disclosed no 2006 Bentley purchased in May 2007, no interest in the Calle Escuda home, and no ownership of white furniture in the Calle Escuda residence. *See* Exhibit 7. The Center provided no documentation to refute Exhibit 7, or shed light on how the assets at issue in this Adversary Proceeding were owned by the Center.

**19.** Exhibit C.

**20.** There is conflicting information concerning the sale of the 2006 Bentley. In the Joint Pretrial Statement, the Trustee asserts that the Bentley sold for the amount of $100,000 based upon Exhibits 4 and 5 to the Complaint. See Joint Pretrial Statement, Docket Entry No. 28, ¶3, Disputed Facts, at p. 2. At the trial, the Debtor testified that the 2006 Bentley sold for $105,000.

**21.** Exhibit 2, Statement of Financial Affairs, Item 10a.

6

2006 Bentley, and noted that it was placed in the Debtor's name just as the Escalade had been placed in his name, that the vehicle did not belong to the Debtor, and that the down payment in excess of $51,000 did not come from the Debtor's account.[22] He believed that when the vehicle was sold in August 2008, any funds received belonged to the Center. Mr. Hopkins conceded on cross examination that he did not have a copy of the relevant Board minutes. The documents should have been produced, and he stated that the Debtor had access to such Board minutes and would have been able to produce them. He also conceded that he did not actually see the documentation underlying the purchase of the 2006 Bentley. He trusted the administrative help at the Center as to what had transpired.

### The residence at 1815 W. Calle Escuda, Phoenix, Arizona

The Debtor testified that he resided at 8724 N. 35th Avenue, Phoenix, Arizona, when he filed his Chapter 7 petition. He stated that he received his mail at that location, and that his belonging were also located at the 35th Avenue address. Apparently he believed the property listed on Schedule A was "where his wife was," and presumably they were separated at the time of the filing of his petition. However, his testimony begs the question. At the time he filed the Chapter 7 petition, he claimed ownership of the residence at 1815 W. Calle Escuda, Phoenix, Arizona. The Debtor did not file a Petition for Dissolution of Marriage until around February 19, 2009,[23] well after the October 31, 2008 filing date of his Chapter 7 petition, yet he still listed the Calle Escuda residence as his "marital residence" and where he lived. On his bankruptcy Schedules and Statement of Financial Affairs, he listed the value of the residence in the amount of $585,000, claimed a homestead exemption in the amount of $150,000, a lien against the residence in the amount of $674,067, and signed the Schedules under penalty of perjury. In the Petition for Dissolution of Marriage, the Debtor stated that as of February 2009, well after he filed his bankruptcy petition, he and Ms. Steele still resided at 1815 W. Calle Escuda, Phoenix, Arizona, that it was the "marital residence," that the residence should be placed

---

22. Exhibit C.

23. Exhibit 5.

7

on the market to be sold, and that any net proceeds from the sale should be distributed half to the Debtor and half to Ms. Steele.[24] The Debtor conceded that as a result of the divorce proceedings, the Calle Escuda residence was placed on the market for $785,000, from which one-half of the net proceeds would be paid to him. The Debtor did not state on the Petition for Dissolution of Marriage that residence belonged to the Center.

## III. LEGAL ANALYSIS

### A. PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547(b)

Under 11 U.S.C. § 547 the bankruptcy trustee may recover certain transfers made by the debtor within 90 days before filing for bankruptcy, if the trustee proves: (1) a transfer of an interest of the debtor in property; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt; (4) made while the debtor was insolvent; (5) made on or within 90 days before the date of the filing of the petition; and (6) one that enables the creditor to receive more than such creditor would receive in a Chapter 7 liquidation of the estate. In re Superior Stamp & Coin Co., Inc., 223 F.3d 1004 (9th Cir. 2000); In re Adbox, Inc., 488 F.3d 836 (9th Cir. 2007). All elements of a preference must be established before the trustee can avoid a transfer as preferential. In re North, 310 B.R. 152 (Bankr. D. Ariz. 2004).

The Trustee asserts that all of the elements of 11 U.S.C. § 547 have been satisfied, and the transfer of $74,578.77[25] to the Center may be avoided as a matter of law. Specifically, the Trustee alleges that to the extent that the Debtor owed a debt to the Center, the transfer of the $74,578.77 to the Center is avoidable by the trustee pursuant to 11 U.S.C. § 547 since the transfer was made to or for the benefit of Center, on account of an antecedent debt owed to the Center by the Debtor, while the Debtor was insolvent, and enabled the Center to receive more than it would in a case under Chapter 7

---

**24.** Exhibit 5, ¶11.

**25.** See Note 1, Page 1 of this Decision.

8

if this transfer had not been made. The Trustee has failed to prove all of the elements of a preference. The trustee carries the burden of proof on the claims under Section 547 by a preponderance of the evidence. In re Chase & Sanborn Corp., 904 F.2d 588 (11th Cir. 1990); In re Bullion Reserve of North America, 836 F.2d 1214 (9th Cir. 1988).

The Trustee has set forth a prima facie case reflecting that the 2006 Bentley was purchased in the Debtor's name for $161,609.28, and the Debtor obtained a loan in the amount of $30,000 from Chase to assist in the purchase. Although the Debtor and the Center asserted that the down payment in the amount of $51,609.28 came from the Center, there was no credible evidence or documentation to support that position. Rather, Exhibit C reflects that the Scottsdale dealer gave the Debtor a credit in the amount of $80,000 for the trade-in of the 2001 Bentley.[26] Since the Debtor and the Center provided no credible evidence, such as payments from the Center's deposit account at the time, that the down payment in the amount of $51,609.28 came from the Center, the Court concludes that the Trustee has shown that the Debtor provided the down payment and obtained the loan in the amount of $30,000. Therefore, the Court concludes that the Debtor contributed $81,609.28 toward the purchase of the 2006 Bentley. Given the purchase price of $161,609.28 for the 2006 Bentley, the Debtor had a one-half interest in the vehicle.[27] When the vehicle was sold for $105,000, the sum of $25,421.23 was utilized to pay off the Chase loan that the Debtor obtained. The Debtor transferred the sum of $74,578.77 to the Center.[28] Presumably the Debtor retained the balance of the purchase

---

**26.** Exhibit C. This is reflected in the right-hand column of the Exhibit under "Less Trade Allow."

**27.** Exhibit C reflects that the amount of $153,000 was the dealer price of the 2006 Bentley. There was also a sales tax of $5,803.50, a document fee of $388, and a license, transfer, and title fee of $2,417.78 for an aggregate purchase price of $161,609.28.

**28.** Exhibit 1, Exhibit 6 thereto, third and fourth pages therein, reflect the payment of $74,578.77 from the Scottsdale dealer to the Debtor and the Center on August 21, 2008. The Debtor admitted at trial that such a payment was made as a result of the sale of the 2006 Bentley. The check reflects that the Debtor endorsed the check in favor of the Center, so that the Center received the full payment. The Trustee has asserted that the actual transfer made by the Debtor to the Center was

9

price, or the sum of $5,000. For a sale of $105,000, with the Debtor retaining a one-half interest, he should have received the sum of $52,500. Rather, he received $25,421.23 to pay off the Chase loan, plus $5,000, or the sum of $30,421.23. Thus, the Center received $22,078.77 more than it should have for its interest in the vehicle.[29] There is no credible explanation as to why the Center received more than its interest in the vehicle. However, this overpayment of $22,078.77 qualifies as a transfer of an interest of the debtor in property. If the Trustee is able to show that the Center is a creditor, the overpayment would have been to, or for the benefit of a creditor, the Center. Therefore, at least one of the elements necessary for a preferential transfer has been met, and the other element may be shown if the Trustee is able to present a prima facie case that the Center was a creditor of the Debtor's at the time of the transfer.[30]

The payment to the Center also occurred within 90 days of the Debtor's filing his bankruptcy petition. The payment was made to the Center on August 20, 2008, 72 days before the October 31, 2008 bankruptcy petition date. Accordingly, this element has been met.

Pursuant to 11 U.S.C. § 547(f), the Debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition. 11 U.S.C. § 547(f); In re Koubourlis, 869 F.2d 1319 (9th Cir. 1989). The Debtor did not come forward with any evidence to rebut the presumption. As such, the Trustee is entitled to the presumption that the Debtor was insolvent during that 90-day period. Thus, this element is also met for 11 U.S.C. § 547(b) analysis purposes.

---

$75,578.77. However, the Trustee failed to show why she believed that was the correct amount other than to assert that the Debtor had "signature authority over the Center's account."

**29.** $52,500 minus the Debtor's payment of $30,421.23 = $22,078.77.

**30.** When the 2006 Bentley was sold, the dealership provided a check in the amount of $74,578.77, which was payable to the Debtor and the Center. The Debtor endorsed the check to permit the Center to receive all of the funds from the sale. However, on this record, that act of endorsement does not create a debtor-creditor relationship. One may categorize the Debtor's actions as an overpayment to the Center for its interest in the vehicle. Was the Debtor transferring those funds for the Center to hold on the Debtor's behalf until the Debtor received his discharge? Was the Debtor simply making a contribution to the Center? The record is unclear.

10

However, the payment to the Center must be as a result of an antecedent debt which the Debtor owed, at the time, to the Center. "An antecedent debt exists when a creditor has a claim against the debtor, even if the claim is unliquidated, unfixed, or contingent." In re Lewinski, 410 B.R. 828 (Bankr. N. D. Ind.2008) (*citing* Warsco v. Preferred Tech. Group, 258 F.3d 557 (7th Cir. 2001). The Trustee has the burden of proving that the payment received by the Center was a transfer of an interest of the debtor in property for or on account of an antecedent debt. The Trustee has presented no evidence of such an antecedent debt. As a result, the Court is also unable to find that the Center received more than it would have if the transfer had not occurred, and the Center had been paid its distribution as an unsecured creditor in a chapter 7 proceeding.

Based upon the foregoing, the Court concludes that the Trustee has failed to set forth a claim pursuant to 11 U.S.C. § 547(b).

B. FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(A)

Turning to Section 548(a)(1)(A), a trustee "may avoid any transfer. . .of an interest of the debtor in property . . . that was made or incurred within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily–

> (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . .

Thus, the trustee must initially prove that (1) the debtor transferred the property, and (2) such transfer took place within two year prior to the filing of the debtor's bankruptcy petition. In re JTS Corp., 617 F.3d 1102 (9th Cir. 2010). The Trustee carries the burden of proof under Section 548. In re Chase & Sanborn Corp., 904 F.2d 588 (11th Cir. 1990); In re Bullion Reserve of North America, 836 F.2d 1214 (9th Cir. 1988). Upon making this initial showing, the trustee is then required to prove that the debtor transferred the property with actual intent to defraud.[31]

As to the 2006 Bentley, although the Court questions why the Debtor transferred the

---

**31.** 11 U.S.C. § 548(a)(1)(A).

11

sum of $74,578.77 to the Center, there is no indication that the Debtor had the actual intent to hinder, delay or defraud creditors. As noted in the Preference Section, the Court concludes that the evidence presented reflected that the Debtor did have a one-half interest in the vehicle. Although the Debtor transferred an excessive amount of money to the Center, it was more as result of gross negligence or incompetence.

### C. FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(B)

Section 548(a)(1)(B) allows a trustee to avoid a transfer if it is made within two years of filing a bankruptcy petition and the debtor received less than reasonably equivalent value in exchange for the transfer. In re Bledsoe, 569 F.3d 1106 (9th Cir. 2009). The Trustee argues that the transfer of $74,578.77[32] to the Center is avoidable by the trustee as the transfer was made when the Debtor was insolvent and the Debtor did not receive any consideration in exchange for the transfer.

Here, the transfer occurred within the 90-day period before the Debtor filed his bankruptcy petition. When the Debtor filed his petition, his schedules reflected assets with a value of $838,270 and liabilities of $1,061,194. Section 101(32) states that with respect to an "entity," it is considered insolvent if the sum of the entity's debts is greater than the fair value of the entity's property exclusive of the property transferred and the property claimed exempt. The Debtor is an "entity" within the definition of Section 101(32), since an entity may be defined as a "person" pursuant to Section 101(15), and a person may include an individual such as the Debtor pursuant to Section 101(41). Moreover, since the Debtor claimed the house on Calle Escuda as exempt, with a value of $585,000, the Court could exclude that value in determining the fair value of the Debtor's property at the time he filed his bankruptcy petition.[33] On this record, the Trustee has shown, through the Debtor's Schedules, that the Debtor was insolvent at the time that the transfer to the Center occurred, and the Debtor has

---

**32.** Again, the Debtor endorsed a check in the amount of $74,578.77 to the Center. The Trustee did not clarify why she was seeking more than the amount of the check in her various claims. See Note 1, Page 1 of this Decision.

**33.** 11 U.S.C. § 101(32) excludes the value of property claimed as exempt in determining whether a debtor is insolvent.

12

presented no controverting evidence.

Since the Debtor transferred more than the Center's one-half interest in the vehicle, the Center received the sum of $22,078.77 for which the Debtor received no consideration or value. Therefore, the Debtor received less than reasonably equivalent value for his interest in the 2006 Bentley.

Section 548(a)(2)(A) prevents the trustee from avoiding as constructively fraudulent a charitable contribution to a qualified religious or charitable organization if the amount of the contribution was not more than 15 percent of the debtor's gross annual income ("GAI"). In re Lewis, 401 B.R. 431 (Bankr. C.D. Cal. 2009). Section 548(a)(2)(B) prevents the trustee from avoiding a charitable contribution to a qualified organization that exceeded 15% of the debtor's GAI, if the contribution was consistent with the debtor's practices of making charitable contributions. Id. However, the Debtor presented no evidence to reflect that he was within Subparagraph (A) or (B). Under Subparagraph (A), the Debtor testified that he had no regular income from the Center, and he was only receiving social security. Thus, the transfer to the Center was well in excess of 15 percent of the Debtor's asserted GAI. The Debtor also does not meet the test under Subparagraph (B), since the Debtor presented no evidence as to his practices in making charitable contributions to the Center.

Upon finding that a Debtor has fraudulently transferred property, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property" from the transferee. 11 U.S.C. § 550(a). Since the Court has concluded that a constructive fraudulent conveyance has occurred in the transfer of $22,078.77 to the Center, the Trustee may recover that transfer from the Center. 11 U.S.C. § 550.

D. OTHER ASSETS

As to the other assets, the Court does not see any fraudulent transfers. The Trustee presented no evidence of value as to the Calle Escuda residence. Although the Debtor may have listed the residence for a value in excess of $585,000, the Trustee presented no evidence that the actual value of the residence was in excess of the liens that encumbered it.

13

As to the white furniture in the living room, it was destroyed in a fire in September 2010. The Court concludes that the furniture was purchased by the Center for the Debtor, so that he would have some "nice furnishings" in his new home. As a result, the white furniture would have been property of the estate when the Debtor filed his bankruptcy petition. However, given the fact that the Debtor was married at the time he filed his petition, it would have been classified as community property. The Trustee apparently viewed this furniture at the storage location which was under the control of the Debtor or the Center. However, the Trustee did not demand that the property be insured, and did not insure it herself. The Trustee also did not have someone separately appraise the furniture. As a result, the Court is unable to ascribe a value that must be paid by the Debtor or the Center for the loss of the bankruptcy estate's interest in this furniture.

### E. REVOCATION OF DISCHARGE

The Trustee also seeks the revocation of the Debtor's discharge pursuant to § 727 (d)(1) and (2). Pursuant to 11 U.S.C. § 727 (d)(1), the Court shall revoke a discharge if the discharge was obtained through the fraud of the debtor and the trustee did not know of such fraud until after the granting of the discharge. In re Fehrs, 391 B.R. 53 (Bankr. D. Idaho 2008). Additionally, pursuant to 11 U.S.C. § 727 (d)(2), the Court shall revoke a discharge if the debtor acquired property that would be property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee.

A right to a discharge is left to the sound discretion of the Bankruptcy Court. Shaver v. Shaver, 736 F.2d 1314, 1316 (9th Cir.1984). The statute for setting aside a discharge on account of fraud requires that the discharge be "obtained through" the fraud. "[O]btained through" is causation language. In re Nielsen, 383 F.3d 322 (9th Cir. 2004). The Trustee must prove that the debtor committed fraud in fact. In re Edmonds, 924 F.2d 176 (10th Cir. 1991). The fraud must be proven in the procurement of the discharge and sufficient grounds must have existed which would have prevented the discharge. In re Bowman, 173 B.R. 922, 925 (9th Cir. BAP 1994). The intentional omission of

14

Case 2:09-ap-00635-SSC    Doc 36    Filed 03/31/11    Entered 03/31/11 14:49:18    Desc
Main Document    Page 14 of 17

assets from the debtor's schedules qualifies as grounds for revocation of discharge under Section 727(d)(1). See 6 Collier on Bankruptcy ¶ 727.17[2] (16th Ed. Rev. 2010). The court may also infer fraudulent intent from all the facts and circumstances of the case. In re Devers, 759 F.2d 751 (9th Cir. 1985).

The Debtor did not disclose the sale of the 2006 Bentley, or the transfer of the $74,578.77 to the Center, or the payoff of his Chase loan, in his Statement Of Financial Affairs. The Debtor reported in his Schedules that his residence was only worth $585,000.00, that he had only $2,100.00 of household goods and furnishings, and that he had no furs or jewelry. However, the house was listed for sale at $785,000.00, and the Debtor's furniture and furnishings, jewelry and furs, including a white baby grand piano, had a value far in excess of $2,100. The Debtor reported in his Schedule I that he was "unemployed," with few sources of income other than social security and some de minimus payments from the Center, when he was, in fact, being paid $8,000.00 to $10,000.00 per month by the Center.

The deadline to file a complaint objecting to discharge was January 30, 2009.[34] It is clear that the Trustee had no knowledge of the Debtor's interest in the 2006 Bentley, the white furniture, or the many inaccuracies in the Debtor's Schedules and Statement of Affairs until the Trustee was notified by the attorney for the Debtor's spouse in mid-March 2009. The Trustee then began the process of diligently investigating for possible fraudulent conduct once she was put on notice of the omissions and misstatements in the Debtor's schedules. In re Fehrs, 391 B.R. 53 (Bankr. D. Idaho 2008) (to satisfy burden on lack of knowledge element, party must demonstrate they exercised reasonable diligence in investigating the facts once they became aware of a potential fraud.) The Debtor received his Chapter 7 discharge on May 6, 2009. The Trustee commenced this Adversary on June 9, 2009.

Based upon the evidence presented, the Court concludes that the Debtor's Schedules and Statement of Affairs were misleading. The Debtor presented no credible evidence as to the many

---

**34.** Docket Entry No. 5.

15

Case 2:09-ap-00635-SSC    Doc 36    Filed 03/31/11    Entered 03/31/11 14:49:18    Desc
Main Document    Page 15 of 17

inaccuracies in his Schedules and Statement of Affairs. As noted above, the Debtor made statements to this Court under oath, and made different statements to the State Court, on such critical issues as to where he resided or whether the Calle Escuda residence was the marital residence. There is no way for the Court to reconcile the many inaccuracies contained in the documents that the Debtor filed with this Court under penalty of perjury. It was only after the Trustee brought to the Debtor's attention the many inaccuracies that the Debtor had made, and after she had commenced this Adversary, that the Debtor took any steps to amend the documents he had filed with this Court. The Trustee would not have known of these substantial inaccuracies but for the information she received from the attorney for the Debtor's spouse. However, the Trustee must show a key element to revoke a discharge: that once she learned of the possible omissions and misstatements in the Debtor's schedules, she was unable to act in time to prevent the entry of the discharge order. In this case, when the Trustee filed her complaint, she had numerous exhibits attached that were provided by the counsel for the Debtor's estranged spouse. These documents were received by the Trustee several months before the Debtor received his discharge. Curiously, given the detail in the documents provided, the Trustee did not state what extensive investigation she needed to do before she filed her complaint. From the Court's standpoint, the Trustee could have taken a few Rule 2004 Examinations to ensure that the documents provided by the estranged spouse most likely reflected conduct that warranted a denial of the Debtor's discharge. If the Trustee needed additional time thereafter to investigate further, she could have filed a motion with the Court to delay entry of the discharge.[35] Because the Trustee has failed to present sufficient evidence that she diligently investigated the allegations of the estranged spouse, and was unable to file her complaint prior to the entry of the Debtor's discharge, the Court concludes that the she has failed to carry her burden that the Debtor fraudulently obtained his discharge such that it should be revoked.

---

**35.** In the District of Arizona, bankruptcy trustees do file such motions with a fair amount of regularity. At times, even debtors file a motion to delay entry of a discharge because they wish to finalize a reaffirmation agreement with a creditor and file the agreement with the Court.

16

Case 2:09-ap-00635-SSC   Doc 36   Filed 03/31/11   Entered 03/31/11 14:49:18   Desc
Main Document    Page 16 of 17

The Court also concludes that the Trustee has failed to carry her burden that revocation is appropriate pursuant to 11 U.S.C. § 727(d)(2). Section 727(d)(2) applies only to property acquired by a debtor after the petition date. In re Thunberg, 413 B.R. 20 (Bankr. D. R. I. 2009); In re DeMaia, 217 F.3d 838, tbl. (4th Cir. 2000). Therefore, the Debtor has a duty to report to the trustee any acquisitions of property *after* the filing of the petition, with the failure to do providing a basis for the revocation of the discharge pursuant to Section 727(d)(2). See 6 Collier on Bankruptcy ¶ 727.17[4] (16th Ed. Rev. 2010). The Trustee did not allege or present evidence that the Debtor acquired any property postpetition that he failed to disclose. Accordingly, the Trustee's request for relief pursuant to Section 727(d)(2) is denied.

## IV. CONCLUSION

The Court concludes that the transfer was constructively fraudulent under Section 548(a)(1)(B) of the Bankruptcy Code. Pursuant to Section 550, the Trustee is entitled to recover the sum of $22,078.77 from the Center for the benefit of the estate. For the reasons stated in this decision, the Court must deny the Trustee's request for relief under Sections 547(b), 548(a)(1)(A), and 727(d)(1) and (d)(2). The Trustee shall lodge an appropriate form of judgment and order in this matter.

DATED this 31st day of March, 2011.

Honorable Sarah Sharer Curley
U. S. Bankruptcy Judge

17

Case 2:09-ap-00635-SSC    Doc 36    Filed 03/31/11    Entered 03/31/11 14:49:18    Desc
Main Document    Page 17 of 17